IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 21-265 |
| | ) | |
| ALBERT CUMMINGS | ) | |

## UNITED STATES SENTENCING MEMORANDUM

### I. INTRODUCTION

The great majority of the people on this planet never have, and never would, deal drugs like fentanyl and heroin. They know those drugs kill people, destroy families, and demoralize communities. In 2020 and 2021, the defendant, Albert Cummings, knew that too. Mr. Cummings chose to engage in the interstate trafficking of fentanyl and heroin anyway – despite over 25 prior convictions from separate Ohio prosecutions throughout the last 25 years, including several separate convictions for cocaine trafficking, domestic violence, and gun crimes. He was also on bond in 2020 and 2021 with pending Ohio charges for gun and fraud crimes.

Mr. Cummings pled guilty in this case to conspiring to distribute at least 40 grams of fentanyl and at least 100 grams of heroin in 2020 and 2021. In pleading guilty to committing this crime (a lesser included offense of Count 1 of the Superseding Indictment), he admitted responsibility for the distribution of 200 grams of fentanyl and 200 grams of heroin. He is pending sentencing.

The guideline range in this case, calculated under the United States Sentencing Guidelines, is 100-125 months in prison (offense level 27/criminal history category IV with 9 criminal history points). The statutory minimum sentence is 60 months in prison. A sentence below the guideline range would fail to account for what Mr. Cummings did and how long he has been doing such

1

things. A sentence below the guideline range would also treat dissimilar conduct similarly and would fail to adequately protect the public from future crimes.

## II. CRIME AFTER CRIMES

In 2020 and 2021, the FBI, the DEA, and the Pennsylvania Attorney General's Office investigated a drug trafficking organization that was responsible for distributing large quantities of narcotics, including fentanyl and heroin, in Mercer County in this district. Jimmy Gadson was one of the most prominent members of the organization. Gadson's cell phone was the subject of a judicially authorized wiretap between March and June 2021.

Communications were intercepted in March 2021 revealing that Mr. Cummings and Gadson had an agreement to work together to distribute fentanyl and heroin. The agreement included Mr. Cummings, who resided in Cleveland, Ohio, traveling to Mercer County to supply fentanyl and heroin to Gadson and others. For example, on March 30, 2021, Mr. Cummings traveled to Gadson's residence on Sherman Avenue in Sharon with a new supply of fentanyl and heroin.

Mr. Cummings communicated by cell phone with Gadson prior to traveling to Gadson's residence that day. At the beginning of the call with Gadson, Mr. Cummings stated, "What's up, bro? I got some of this fire" – referring to the supply of fentanyl and heroin Mr. Cummings possessed. Gadson replied, "What's it like? You know I'm on the, you know I'm on the top of the world right now" – asking about the quality of the fentanyl and heroin and indicating that he did not need re-supplied on that date. Gadson then stated "I mean if it's better and the price is better, you know, all you gotta do is let me see what it's like" – expressing that he was open to being supplied by Mr. Cummings if the price and quality of the fentanyl and heroin were good. Mr. Cummings replied with the question "What, you gonna have your people do it?" – asking if Gadson

wanted to check the quality by supplying some to customers. Gadson answered, "Yeah," and Mr. Cummings stated, "A'ight, I'll be going there in a little while" – informing Gadson of his plan to travel to Gadson's residence with the new supply of fentanyl and heroin.

Later that day, Mr. Cummings arrived at Gadson's residence with the supply of fentanyl and heroin. Gadson was not at his residence at that time, prompting a cell phone conversation between them. During the conversation, Gadson told Mr. Cummings to leave a sample of the fentanyl and heroin inside the residence. Mr. Cummings agreed, stating "I'ma leave two of the, I got two different kinds. I'ma leave both of them." Gadson then instructed Mr. Cummings on where to hide the fentanyl and heroin, stating "you can take it upstairs or throw it in the trash can, under the, uh, under the bag." Mr. Cummings agreed with Gadson, stating "Yeah, I'ma put it in the trash can, under the bag."

On May 24, 2021, surveillance observations revealed that Mr. Cummings once again traveled from Cleveland to Gadson's residence on Sherman Avenue in Sharon to further his drug dealing. Gadson was out of state on that date. Mr. Cummings drove a Dodge pickup truck from Cleveland to Sharon on that date. After arriving outside Gadson's residence in the Dodge truck, Mr. Cummings was observed meeting with co-defendant Denzel Williams. Wiretap communications revealed that Williams helped Gadson distribute fentanyl and heroin on several occasions between March and June 2021.

After meeting with Williams, Mr. Cummings drove the Dodge truck back to Cleveland. Case agents requested assistance from Ohio police officers with conducting a traffic stop of Mr. Cummings in an attempt to interdict the drugs and/or proceeds in his truck. Mr. Cummings refused to pull over and proceeded to recklessly drive through traffic, ranging in speeds up to 100 miles per hour. As a result of the danger Mr. Cummings was creating by his flight from the pursuing

3

police officers, the officers called off the pursuit and Mr. Cummings was able to get away on that date. As noted above, he was subsequently indicted and convicted in this case.

Reckless flight from pursuing police officers and resisting arrest is a common theme of Mr. Cummings's criminal record. He has been convicted in Ohio of fleeing/resisting arrest on five separate occasions as an adult. As noted above, he has over 25 convictions from separate Ohio prosecutions throughout the last 25 years. He was convicted in every year between 1999 and 2007. The convictions were primarily for relatively minor offenses, but some were for serious crimes, including for cocaine trafficking. None of these numerous pre-2008 convictions were counted in the calculation of his criminal history category under the Sentencing Guidelines.

Between 2008 and 2021, Mr. Cummings was convicted in two separate Ohio prosecutions of cocaine trafficking, including near a school. He was also convicted in Ohio in 2017 of unlawfully possessing a firearm. Another Ohio prosecution also resulted in convictions in 2017 for domestic violence, aggravated menacing, stalking, and burglary. His convictions since 2008 resulted in sentences ranging from suspended sentences to three years in prison.

Finally, it is noteworthy that, in 2020 and 2021, when Mr. Cummings was engaging in the interstate fentanyl and heroin trafficking that led to his conviction in this case, he was on bond from two Ohio prosecutions for gun and fraud crimes. Those prosecutions are still pending. Regardless of the outcome of those prosecutions, the fact that Mr. Cummings chose to traffic fentanyl and heroin while he was on bond for other serious crimes further establishes that a below-guideline sentence in this case would be unjustified.

### III. REALITY AND RHETORIC

It is important to state what is obvious now and what was likewise obvious when Mr. Cummings was engaging in recidivist drug dealing in 2020 and 2021. Tens of thousands of our

fellow citizens are dying every year directly from drug dealing, leaving their families torn apart. Drug dealing leads to many derivative crimes tormenting our communities, from homicides to home invasions, from burglaries to embezzlements, and from child neglect to DUI and many other crimes. While there are foreign actors who are clearly culpable for the production of the toxic drugs, no one is more culpable than the recidivist drug dealers who refuse to stop peddling their products in our communities despite full, up-close-and-personal knowledge of the carnage they are causing.

The fact that Mr. Cummings is facing a long prison sentence is a shame. It is a reality, however, that he chose to create. He did so with full knowledge of the carnage he could cause and the likely consequences for getting caught, particularly following his prior convictions. He should, therefore, be ashamed of himself.

Shame, in the sentencing context, is a psycho-social reaction to society's confirmation that a defendant did something that was morally wrong and a defendant's corresponding recognition of that fact. Those defendants who not only "paid" for their crimes through time, but who are also ashamed of their crimes are much more likely to lead virtuous future lives. *See, e.g.,* Edmund Burke, *Reflections on the Revolution in France* ("Whilst shame keeps its watch, virtue is not wholly extinguished in the heart[.]"); Samuel Johnson, *Journey to the Western Islands of Scotland* ("Where there is yet shame, there may in time be virtue.").

Debates about sentence lengths for drug dealers are too often premised on the assumption that the primary justification for such sentences is transactional. It is as if drug dealers have the prerogative to purchase the opportunity to endanger the community and to harm families through payments of time. No one has that prerogative.

The "do the crime/do the time" mantra is an accurate observation about sentencing; it is not the primary justification for sentencing. The primary justification for sentencing is, and must be, moral, not transactional. Sentencing is a morality lesson for the defendant and for society that is a necessary component of a healthy culture. The regulating and moderating impact of culture reduces the need for the expansion and application of law – thus reducing the number of crimes and future sentencings. Focusing on morality, instead of transactionality, fosters the conditions for salutary shame.

Any attempt to minimize Mr. Cummings's criminal conduct, and his sentence, by arguing that imposing a long prison sentence does not make sense because other drug dealers will take, or have taken, his place should be rejected. There are too many drug dealers, but there are not that many. We should seek to isolate such bad behavior instead of attempting to minimize it by pretending that it is popular. Most Americans despise drug dealing and desire to protect their families and their communities from the devastating effects of drug dealing. It is an insult to the members of our communities that are most plagued by drug dealing to suggest that many of them have a "next man up" mentality when a drug dealer is removed from the street to prison.

The small fraction of people who are willing to deal drugs in our communities do not resort to drug dealing because they have no other option to support themselves and their families. Thousands upon thousands of communications between drug dealers can be reviewed without finding a single communication of a drug dealer lamenting about unsuccessfully attempting to find a job. Mr. Cummings did not need to deal drugs to support himself or anyone else. Any suggestion to the contrary is revisionist history.

In any event, there is absolutely no excuse for distributing substances that kill people and leave their families in misery. Even if the perpetually contradicted claims of "I was just dealing

6

to support my family" or "I was just dealing to support my habit" were true, they would not come close to incrementally excusing such crimes. It is not acceptable to jeopardize the lives of others and risk placing other families in misery to supposedly support your habit or your family.

Moreover, all drug dealing is dangerous and threatens to kill people and destroy families regardless of whether it is carried out with a friendly grin or a gun. It is illogical to treat non-violence as a mitigating factor when it comes to the distribution of substances that kill people. The presence of violence can make drug dealing worse, but the absence of violence does not make drug dealing any better – just like the absence of violence in the commission of environmental pollution crimes would not make them any better. Drug dealing is, at its core, pollution for profit. It should not make anyone feel better that the majority of the thousands of our fellow citizens who are killed each year by drug dealing die from "non-violent" drug dealing.

## IV. CONCLUSION

Our society has the right to engage in self-defense against drug dealers who refuse to stop dealing drugs. Incarceration is societal self-defense against those who, like Mr. Cummings, refuse to stop committing crimes. It is one of civil society's earliest and most fundamental forms of social distancing. A sentence within the guideline range in this case would be fully justified.

Respectfully submitted,

ERIC G. OLSHAN
United States Attorney

s/ Craig W. Haller
CRAIG W. HALLER
Assistant U.S. Attorney
700 Grant Street, Suite 4000
Pittsburgh, PA 15219
(412) 644-3500 (Phone)
craig.haller@usdoj.gov
PA ID No. 87714